UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| FINANCIAL GUARANTY INSURANCE COMPANY,<br><br>      Plaintiff,<br><br>   -against-<br><br>ALEJANDRO GARCÍA PADILLA, JUAN C. ZARAGOZA GÓMEZ, INGRID RIVERA ROCAFORT, MELBA ACOSTA FEBO, LUIS F. CRUZ BATISTA, VÍCTOR A. SUÁREZ MELÉNDEZ, CÉSAR A. MIRANDA RODRÍGUEZ, JUAN FLORES GALARZA, and JOHN DOES 1-40,<br><br>      Defendants. | No. 16-1095 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Financial Guaranty Insurance Company ("***Plaintiff***" or "***FGIC***"), by its attorneys Rexach & Picó, CSP and Butler Snow LLP, for its Complaint against defendants Hon. Alejandro García Padilla, Hon. Juan C. Zaragoza Gómez, Hon. Ingrid Rivera Rocafort, Hon. Melba Acosta Febo, Hon. Luis F. Cruz Batista, Hon. Víctor A. Suárez Meléndez, Hon. César A. Miranda Rodríguez, Hon. Juan Flores Galarza, and John Does 1-40 (collectively, "***Defendants***"), alleges as follows:

## NATURE OF THIS ACTION

1. Section 8 of Article VI ("***Article VI***") of the Constitution (the "***Commonwealth Constitution***") of the Commonwealth of Puerto Rico (the "***Commonwealth***"), the Management and Budget Office Organic Act, Act No. 147 of June 18, 1980 (the "***OMB Act***") and the executive orders (the "***Executive Orders***") issued on November 30, 2015 and December 8, 2015 by The Honorable Governor García Padilla are unconstitutional.  Through this action, Plaintiff

seeks a declaratory judgment that Section 8 of Article VI of the Commonwealth Constitution, the OMB Act and the Executive Orders are preempted by the Constitution of the United States of America (the "*United States Constitution*") and federal law and are without force and effect (*see generally* paragraphs 60-92). Plaintiff also seeks an injunction enjoining Defendants from taking or causing to be taken any and all actions pursuant to Section 8 of Article VI of the Commonwealth Constitution, the OMB Act and the Executive Orders because such actions will constitute violations of Plaintiff's constitutionally-protected property interests and contractual rights.

2.      The United States Constitution and federal law preclude the Commonwealth from enacting a bankruptcy law that adjusts the debts of its instrumentalities and public entities and binds non-consenting creditors. The United States Congress has enacted a federal Bankruptcy Code, expressly providing that States have no power to enact their own laws for adjusting debts, *see* 11 U.S.C. § 903(1), and excluding the Commonwealth's instrumentalities from participating in the federal bankruptcy system, *see* 11 U.S.C. §§ 101(40), (52), 109(c). Despite these prohibitions, Section 8 of Article VI of the Commonwealth Constitution, the OMB Act and the Executive Orders purport to (a) authorize the Commonwealth to adjust debts, to defer repayment and to decrease interest and principal owed by the Commonwealth's instrumentalities and public entities and to bind non-consenting creditors, (b) permit the Commonwealth to seize and use Plaintiff's collateral without providing adequate protection, and (c) establish an overriding priority scheme to distribute Plaintiff's collateral in contravention of binding contractual obligations and federal law.

3.      In the alternative, the Executive Orders are unconstitutional because they violate Plaintiff's constitutionally-protected property interests and contractual rights. Plaintiff seeks a

declaratory judgment that the Executive Orders violate the United States Constitution and are without force or effect. Plaintiff also seeks an injunction enjoining Defendants from taking or causing to be taken any and all actions pursuant to the Executive Orders because such actions will constitute violations of Plaintiff's constitutionally-protected property interests and contractual rights.

4.     The Executive Orders direct the Secretary of Treasury of the Commonwealth of Puerto Rico and the Puerto Rico Tourism Company to retain or transfer certain taxes and revenues (the "***Pledged Funds***") pledged to secure the payment of bonds (the "***Authority Bonds***") issued by the Puerto Rico Highways and Transportation Authority ("***PRHTA***"), the Puerto Rico Convention Center District Authority ("***PRCCDA***"), and the Puerto Rico Infrastructure Financing Authority ("***PRIFA***", and together with PRHTA and PRCCDA, the "***Authorities***") (*see generally* paragraphs 33-44). The Authority Bonds are secured by liens on the Pledged Funds.

5.     FGIC insures approximately $1.2 billion in aggregate principal amount of the indebtedness of the Commonwealth and its public corporations, including the Authorities. Defendants have injured FGIC by causing at least $164 million to date of the Pledged Funds to be diverted from the security and payment of the Authority Bonds to other, unconstitutional uses.

6.     The Executive Orders are unconstitutional because they substantially and unjustifiably impair the contractual rights of Plaintiff and of the holders of the Authority Bonds (the "***Authority Bondholders***"). This impairment violates the contracts clause (the "***Contracts Clause***") of Article I, Section 10, Clause 1 of the United States Constitution (*see generally* paragraphs 93-135). Although the liens granted to the Authority Bondholders are subject to payment first of public debt, that does not authorize the Defendants to "claw back" or divert the

Pledged Funds under the circumstances described in the Executive Orders, namely, where other available resources exist from which the public debt could be paid.

7.      The Executive Orders are also unconstitutional because they constitute a misappropriation and diversion of secured bondholder collateral that has and will deprive FGIC and the Authority Bondholders of their lawful property interests in and due process rights with respect to the Pledged Funds in violation of the takings clause (the "***Takings Clause***") of the Fifth Amendment of the United States Constitution, the due process clauses (the "***Due Process Clauses***") of the Fifth and Fourteenth Amendments of the United States Constitution and the equal protection clause (the "***Equal Protection Clause***") of the Fourteenth Amendment of the United States Constitution (*see generally* paragraphs 93-141).  At all times herein, Defendants have been acting under color of Section 8 of Article VI of the Commonwealth Constitution, the OMB Act and the Executive Orders and have deprived FGIC and the Authority Bondholders of their rights secured by the Takings Clause, the Due Process Clauses and the Equal Protection Clause of the United States Constitution.  Based on these violations of FGIC's and the Authority Bondholders' rights under the United States Constitution, FGIC also seeks relief pursuant to 42 U.S.C. § 1983.

## THE PARTIES

8.      Plaintiff Financial Guaranty Insurance Company is a New York stock insurance corporation with its principal place of business at 521 Fifth Avenue, New York, New York 10175.

9.      Plaintiff is a monoline insurer that has issued guaranty insurance policies insuring public finance, structured finance, and other obligations.

10.      Plaintiff brings this action to protect and enforce its rights under the United States Constitution, as described below.

11.     Defendant Hon. Alejandro García Padilla (the "***Governor***") is the Governor of the Commonwealth and issued the Executive Orders. Plaintiff sues the Governor in his official capacity.   Defendant Hon. Alejandro García Padilla is an adult resident citizen of the Commonwealth.

12.     Defendant Hon. Juan C. Zaragoza Gómez (the "***Secretary of Treasury***") is the Secretary of Treasury of the Commonwealth and is empowered to implement the Executive Orders. Plaintiff sues the Secretary of Treasury in his official capacity.  Defendant Hon. Juan C. Zaragoza Gómez is an adult resident citizen of the Commonwealth.

13.     Defendant Hon. Ingrid Rivera Rocafort (the "***Executive Director***") is the Executive Director of the Puerto Rico Tourism Company (the "***Puerto Rico Tourism Company***") and is empowered to implement the Executive Orders. Plaintiff sues the Executive Director in her official capacity.  Defendant Hon. Ingrid Rivera Rocafort is an adult resident citizen of the Commonwealth.

14.     Defendant Hon. Melba Acosta Febo (the "***GDB President***") is the President of the Government Development Bank for Puerto Rico (the "***GDB***") and a member of the Working Group for the Fiscal and Economic Restoration of Puerto Rico created pursuant to Administrative Bulletin Number OE-2015-22 (the "***Working Group***") and is empowered to implement the Executive Orders. Plaintiff sues the GDB President in her official capacity as the GDB President and in her official capacity as a member of the Working Group.  Defendant Hon. Melba Acosta Febo is an adult resident citizen of the Commonwealth.

15.     Defendant Hon. Luis F. Cruz Batista (the "***OMB Director***") is the Director of the Commonwealth's Office of Management and Budget (the "***OMB***") and is empowered to

implement the Executive Orders. Plaintiff sues the OMB Director in his official capacity. Defendant Hon. Luis F. Cruz Batista is an adult resident citizen of the Commonwealth.

16.     Defendant Hon. Víctor A. Suárez Meléndez (the "***Secretary of State***") is the Secretary of State of the Commonwealth and a member of the Working Group and is empowered to implement the Executive Orders. Plaintiff sues the Secretary of State in his official capacity as a member of the Working Group.  Defendant Hon. Víctor A. Suárez Meléndez is an adult resident citizen of the Commonwealth.

17.     Defendant Hon. César A. Miranda Rodríguez (the "***Secretary of Justice***", and together with the GDB President and the Secretary of State, the "***Working Group Members***") is the Secretary of Justice of the Commonwealth and a member of the Working Group and is empowered to implement the Executive Orders. Plaintiff sues the Secretary of Justice in his official capacity as a member of the Working Group. Defendant Hon. César A. Miranda Rodríguez is an adult resident citizen of the Commonwealth.

18.     Defendant Hon. Juan Flores Galarza is the Sub-Secretary (the "***Sub-Secretary***") of the Treasury of the Commonwealth and is empowered to implement the Executive Orders. Plaintiff sues the Sub-Secretary in his official capacity. Defendant Hon. Juan Flores Galarza is an adult resident citizen of the Commonwealth.

19.     Defendant John Doe 1 is any successor to Hon. Alejandro García Padilla as Governor of the Commonwealth. Plaintiff sues John Doe 1 in his or her official capacity.

20.     Defendant John Doe 2 is any successor to Hon. Juan C. Zaragoza Gómez as Secretary of Treasury of the Commonwealth who is empowered to implement the Executive Orders. Plaintiff sues John Doe 2 in his or her official capacity.

21.     Defendant John Doe 3 is any successor to Hon. Ingrid Rivera Rocafort as Executive Director of the Puerto Rico Tourism Company who is empowered to implement the Executive Orders. Plaintiff sues John Doe 3 in his or her official capacity.

22.     Defendant John Doe 4 is any successor to Hon. Melba Acosta Febo as President of the GDB who is empowered to implement the Executive Orders. Plaintiff sues John Doe 4 in his or her official capacity.

23.     John Doe 5 is any successor to Hon. Luis F. Cruz Batista as Director of the OMB who is empowered to implement the Executive Orders. Plaintiff sues John Doe 5 in his or her official capacity.

24.     Defendant John Doe 6 is any successor to Hon. Juan Flores Galarza as the Sub-Secretary of Treasury of the Commonwealth who is empowered to implement the Executive Orders. Plaintiff sues John Doe 6 in his or her official capacity.

25.     Defendants John Does 7-9 are any successors to the Working Group Members as members of the Working Group who are empowered to implement the Executive Orders. Plaintiff sues John Does 7-9 in their official capacities as members of the Working Group.

26.     Defendants John Does 10-20 are any heads of Commonwealth governmental agencies (collectively, the "***Agency Heads***") who are empowered to implement the Executive Orders. Plaintiff sues the Agency Heads in their respective official capacities.

27.     Defendants John Does 21-30 are any other secretaries of the Commonwealth government, directors of Commonwealth dependencies, or directors of public corporations to whom the Sub-Secretary addressed Circular Letter No. 1300-15-16 (the "***First Circular Letter***"). Plaintiff sues John Does 21-30 in their respective official capacities.

28.     Defendants John Does 31-40 are any employees or other agents of the Commonwealth or of its public corporations or instrumentalities, including the Authorities, the Puerto Rico Tourism Company, or the GDB, who are empowered to implement the Executive Orders. Plaintiff sues John Does 31-40 in their respective official capacities.

## JURISDICTION AND VENUE

29.     This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the United States Constitution. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332, as the parties are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343(3) and (4), because this action seeks injunctive relief pursuant to 42 U.S.C. § 1983.  Plaintiff seeks a declaration and related relief in this case of actual controversy pursuant to 28 U.S.C. §§ 2201 and 2202

30.     This complaint presents an actual controversy that is ripe for adjudication. As described below, pursuant to the Executive Orders, Defendants have already caused injury in fact to Plaintiff by causing Pledged Funds to be diverted from the security and payment of the Authority Bonds to other, unconstitutional uses. On January 1, 2016, the Defendants' diversion of Pledged Funds resulted in a payment default with respect to an approximately $35.941 million interest payment due on bonds issued by PRIFA, as a result of which default FGIC was required to make payments in respect of at least $6,393,666 of claims submitted under FGIC's insurance policy insuring certain of the defaulted PRIFA bonds. These payments by FGIC would not have been necessary but for the Defendants' diversion of the Pledged Funds.

31.     Further, on January 13, 2016, the OMB Director issued that certain Circular Letter No. 128-16 (the "**Second Circular Letter**") in which Defendants directed PRIFA to further divert Pledged Funds from the payment of the PRIFA bonds for the remainder of Fiscal Year

2015-2016.   As a result, the Second Circular Letter purports to divert approximately $113 million in Pledged Funds from payment of the debt service on the PRIFA bonds.   The Defendants' continued diversion of the Pledged Funds will result in additional defaults on the defaulted PRIFA bonds.

32.     Venue is proper in this District under 28 U.S.C. § 1391 because all or a substantial part of the events giving rise to these claims occurred in this District.

## FACTUAL ALLEGATIONS

### I.     FGIC Insures Bonds Issued By The Authorities

33.     Plaintiff is a provider of financial guaranty insurance, which is a type of insurance whereby an insurer guarantees scheduled payments of interest and principal as and when due on a bond or other obligation. Plaintiff insures scheduled principal and interest payments when due on public finance, structured finance and other obligations. Under relevant provisions of the applicable bond documents, bond insurance policies, and applicable law, payment by Plaintiff neither satisfies nor discharges an issuer's obligation to pay and, to the extent Plaintiff makes such payments, it obtains assignments of rights from the bondholders, becomes owner of the bonds, and/or becomes subrogated to the rights of bondholders and effectively steps into the shoes of such bondholders.

34.     One reason governments and municipalities, including the Authorities, have historically taken advantage of financial guaranty insurance is that the insurance of their principal and interest payment obligations may have the effect of significantly enhancing their ability to raise funds. Such insurance is especially important for issuers such as the Commonwealth and Authorities who have—and will have—significant borrowing needs, notwithstanding their lower credit rating. Among other projects, the proceeds of Authority Bonds have been used to finance the construction of the Puerto Rico Convention Center; the

construction of and necessary repairs to numerous toll highways and connecting roads, including PR-20, PR-22, PR-52, and PR-53; and the construction, operation, and maintenance of Tren Urbano, a rapid transit system in the San Juan metropolitan area.

### A.  PRHTA

35.     PRHTA is a public corporation created by Act 74-1965 (the "***PRHTA Enabling Act***") to assume responsibility for the construction of highways and other transportation systems in Puerto Rico. *See* 9 L.P.R.A. § 2002. Under the PRHTA Enabling Act, PRHTA has the power to "sue and be sued," to "make contracts and to execute all instruments necessary or incidental in the exercise of any of its powers," and to issue bonds. 9 L.P.R.A. § 2004(g), (h), (*l*). Pursuant to the PRHTA Enabling Act, PRHTA has issued certain bonds (the "***PRHTA Bonds***") under resolutions (the "***PRHTA Resolutions***") executed in 1968 and 1998.   According to PRHTA's most recent audited financial statements, the aggregate outstanding principal amount of the PRHTA Bonds is approximately $4.4 billion.

36.     Pursuant to the PRHTA Enabling Act and the PRHTA Resolutions, the PRHTA Bonds are secured by PRHTA's property and revenues, as well as by any tax "made available to [PRHTA] by the Commonwealth." 9 L.P.R.A. § 2004(*l*). More specifically, the PRHTA Bonds are secured by a lien on (i) revenues derived from PRHTA's toll facilities; (ii) gasoline, diesel, crude oil, and other excise taxes levied by the Commonwealth pursuant to Act 34-1997, Act 1-2011, and Act 1-2015 (the "***Excise Taxes***"); and (iii) motor vehicle license fees imposed under Act 22-2000 (the "***Vehicle Fees***", and together with the Excise Taxes, the "***PRHTA Pledged Funds***"). The Commonwealth covenanted with the holders of the PRHTA Bonds in the PRHTA Enabling Act that it would "not limit or restrict the rights or powers . . . vested in [PRHTA by the PRHTA Enabling Act] until all such bonds at any time issued, together with the interest thereon, are fully met and discharged." 9 L.P.R.A. § 2019. PRHTA's rights and powers under the

PRHTA Enabling Act include the right and the power to secure the PRHTA Bonds through a pledge of the PRHTA Pledged Funds. *See* 9 L.P.R.A. § 2004(*l*).

37.     FGIC has insured approximately $465 million of PRHTA Bonds currently outstanding. Under its insurance agreements and policies insuring payment of principal of and interest on the PRHTA Bonds, FGIC is deemed to be the sole holder of the PRHTA Bonds that it insures for the purposes of exercising all remedies and controlling and enforcing all rights and remedies of the holders of the PRHTA Bonds. *See, e.g.*, Agreement Regarding Bond Insurance for PRHTA Series N Bonds §§ 4(c), 5; Agreement Regarding Bond Insurance for Series L Bonds §§ 4(c), 5.

### B.     PRCCDA

38.     PRCCDA is a public corporation that was created by Act No. 351 of September 2, 2000 (the "***PRCCDA Enabling Act***") for the purpose of developing and operating a convention center located in San Juan, Puerto Rico, and related improvements and facilities.   *See* 23 L.P.R.A. §§ 6402, 6404. Under the PRCCDA Enabling Act, PRCCDA has the power to sue and be sued, to enter into contracts, and to issue bonds.  *See* 23 L.P.R.A. § 6412(b), (e), (h). Pursuant to the PRCCDA Enabling Act, PRCCDA has issued approximately $468 million of revenue bonds (the "***PRCCDA Bonds***") under a Trust Agreement dated as of March 24, 2006 (the "***PRCCDA Trust Agreement***"). According to PRCCDA's most recent audited financial statements, approximately $420 million of PRCCDA Bonds remain outstanding.

39.     Pursuant to the PRCCDA Enabling Act, Act 272-2003 (the "***Hotel Tax Act***"), and the PRCCDA Trust Agreement, the PRCCDA Bonds are secured by a lien on certain hotel occupancy taxes (the "***PRCCDA Pledged Funds***") imposed by the Commonwealth and collected by the Puerto Rico Tourism Company pursuant to the Hotel Tax Act. The Commonwealth covenanted in the Hotel Tax Act that it (i) would ensure that each month, the PRCCDA Pledged

Funds would be deposited in certain accounts with the trustee for the PRCCDA Bonds to pay principal of and interest on the PRCCDA Bonds, and (ii) would not limit or alter the rights of PRCCDA to comply with its obligations to the holders of the PRCCDA Bonds. Moreover, under the PRCCDA Trust Agreement, PRCCDA, as an agent of the Commonwealth, covenanted that the Commonwealth (i) will "make sure that the amounts [of the PRCCDA Pledged Funds] must be deposited in the accounts as provided in the Trust Agreement" and (ii) will not limit or impair the rights of PRCCDA to comply with its obligations to repay the PRCCDA Bonds in full.  *See* PRCCDA Trust Agreement § 6.01(n), (o).

40.    FGIC has insured approximately $97 million of the outstanding PRCCDA Bonds. Certain of FGIC's rights as an insurer are set forth in a First Supplemental Trust Agreement (the "***First Supplemental Trust Agreement***") to the PRCCDA Trust Agreement, dated as of March 24, 2006. Under the First Supplemental Trust Agreement, FGIC is deemed to be the sole holder of the PRCCDA Bonds insured by FGIC and may enforce any right, remedy, or claim. *See* First Supplemental Trust Agreement § 17(d).

## C.    PRIFA

41.    PRIFA is a public corporation created by Act 44-1988 (the "***PRIFA Enabling Act***") for the purpose of providing financial and other types of assistance to political subdivisions, public agencies, and instrumentalities of the Commonwealth. Under the PRIFA Enabling Act, PRIFA has the power to "sue and be sued," to execute contracts in carrying out its powers and functions, and to issue bonds.  *See* 3 L.P.R.A. §§ 1906(d), (g), (*l*), 1907. Pursuant to the PRIFA Enabling Act, PRIFA has issued certain special tax revenue bonds (the "***PRIFA Bonds***") under a Trust Agreement (the "***PRIFA Trust Agreement***") dated as of October 1, 1988. The aggregate outstanding principal amount of PRIFA Bonds is approximately $1.6 billion.

42.     Pursuant to the PRIFA Enabling Act and the PRIFA Trust Agreement, the PRIFA Bonds are secured by a portion of a federal excise tax imposed on rum and other items produced in the Commonwealth and sold in the United States (the "***PRIFA Pledged Funds***"). In the PRIFA Enabling Act, the Commonwealth covenanted that it would "not limit or alter the rights [conferred to PRIFA by the PRIFA Enabling Act] until such bonds and the interest thereon are paid in full." 3 L.P.R.A. § 1913. PRIFA's rights under the PRIFA Enabling Act include the right to pledge the PRIFA Pledged Funds to the payment of the PRIFA Bonds. *See, e.g.*, 3 L.P.R.A. §§ 1906(k), (m), 1907(a).

43.     FGIC insures approximately $349 million of the outstanding PRIFA Bonds. Following PRIFA's default with respect to a $35.941 million interest payment due on PRIFA Bonds on January 1, 2016, FGIC was required to make payments in respect of at least $6,393,666 of claims submitted under FGIC's insurance policy insuring certain of the defaulted PRIFA Bonds.

44.     For the 2015-2016 Fiscal Year, PRIFA had a special assignment of approximately $117 in PRIFA Pledged Funds, with approximately $113 million allocated for payment of the debt service for the PRIFA Bonds and the remainder allocated for payment of PRIFA's operating costs.  The Second Circular Letter adjusted this obligation by diverting approximately $113 million of the PRIFA Pledged Funds for use by the Commonwealth in accordance with the Executive Orders.  A true and correct copy of the Second Circular Letter is attached hereto as Exhibit A.

## II.   **Commonwealth Debt Priority Provisions**

### A.     **The Commonwealth Constitution**

45.     Article VI of the Commonwealth Constitution contains several provisions dealing with appropriations and the payment of debt and expenses.

46.     First, Section 6 of Article VI provides:

> If at the end of any fiscal year the appropriations necessary for the ordinary operating expenses of the [G]overnment and for the payment of interest on and amortization of the public debt for the ensuing fiscal year shall not have been made, the several sums appropriated in the last appropriation acts for the objects and purposes therein specified, so far as the same may be applicable, shall continue in effect item by item, and the Governor shall authorize the payments necessary for such purposes until corresponding appropriations are made.

> Cuando a la terminación de un año económico no se hubieren aprobado las asignaciones necesarias para los gastos ordinarios de funcionamiento del gobierno y para el pago de intereses y amortización de la deuda pública durante el siguiente año económico, continuarán rigiendo las partidas consignadas en las últimas leyes aprobadas para los mismos fines y propósitos, en todo lo que fueren aplicables, y el Gobernador autorizará los desembolsos necesarios a tales fines hasta que se aprueben las asignaciones correspondientes.

P R. Const. art. VI, § 6.

47.     Accordingly, if the appropriations needed for a fiscal year to cover public debt and ordinary expenses are not made, then the appropriations therefor from the prior fiscal year will be continued.

48.     Next, Section 7 of Article VI provides:

> The appropriations made for any fiscal year shall not exceed the total resources, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law.

> Las asignaciones hechas para un año económico no podrán exceder de los recursos totales calculados para dicho año económico, a menos que se provea por ley para la imposición de contribuciones suficientes para cubrir dichas asignaciones.

P.R. Const. art. VI, § 7.

49.     Accordingly, if the appropriations for a given fiscal year exceed *estimated* revenues, then taxes must be raised.

50.    However, Section 8 of Article VI (the "***Constitutional Debt Priority Provision***")
then provides:

> In case the available resources including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law.
>
> Cuando los recursos disponibles para un año económico no basten para cubrir las asignaciones aprobadas para ese año, se procederá en primer término, al pago de intereses y amortización de la deuda pública, y luego se harán los demás desembolsos de acuerdo con la norma de prioridades que se establezca por ley.

P.R. Const. art. VI, § 8.

51.    Thus, if actual revenues are insufficient in a fiscal year, then "public debt" must be paid first. The Commonwealth Constitution makes clear that if there is an actual shortfall for a fiscal year, public debt enjoys a priority (the "***Public Debt Priority***") over all other disbursements.

52.    The Constitutional Debt Priority Provision further requires all other disbursements to be paid "in accordance with the order of priorities established by law." P.R. Const. art. VI, § 8. The Commonwealth's Legislative Assembly (the "***Legislative Assembly***") has implemented the priorities established by this provision of the Commonwealth Constitution in several laws, including the OMB Act as described below.

**B.    The OMB Act**

53.    Section 4(c) of the OMB Act states the Governor, "[i]n tune with Section 8, Article VI" of the Commonwealth Constitution, "shall act according to the following priority guidelines for the disbursement of public funds, when the available funds for a specific fiscal year are not sufficient to cover the appropriations approved for that year."  23 L.P.R.A. § 104(c).

54.     The priorities set by the Legislative Assembly in these circumstances first require "payment of interest and amortizations corresponding to the public debt." 23 L.P.R.A. § 104(c)(1).

55.     The "priority guidelines" next assign a second-priority status to "commitments entered into by virtue of legal contracts in force, judgments of the courts in cases of condemnation under eminent domain, and binding obligations to safeguard the credit, reputation and good name of the Government of the Commonwealth of Puerto Rico." 23 L.P.R.A. § 104(c)(2).

56.     "Regular expenses" related to government operations receive a third-priority status under Section 4(c) of the OMB Act, with priority within this group given to expenses related to "[conservation of public health," "[p]rotection of persons and property," "[p]ublic education programs," and "[p]ublic welfare programs." 23 L.P.R.A. § 104(c)(3)(A)-(D).

57.     Finally, the OMB Act's "priority guidelines" assign the lowest priorities to "construction of capital works or improvements" (fourth priority) (23 L.P.R.A. § 104(c)(4)) and "contracts and commitments contracted under special appropriations" (fifth priority) (23 L.P.R.A. § 104(c)(5)).

58.     To implement the "priority guidelines," the Governor, or his designee, shall submit to certain members of the Legislative Assembly, "a detailed report of the adjustments" and "recommendations regarding the manner that the postponed works and activities are to be handled."   23 L.P.R.A. § 104(d).   For each adjustment made pursuant to the "priority guidelines," the "obligations corresponding to the postponed works shall be canceled for the purposes of the year which has been adjusted" to be carried over on the Secretary of Treasury's books against funds available for appropriation in subsequent years.   *See id.*   The OMB Act

-16-

further states the Governor may "restrict the funds available to the agencies, in whatever way he deems pertinent, when, in the execution and control of the budget, he considers it necessary regardless of the circumstances established in subsections (c) and (d) of this section."  23 L.P.R.A. § 104(e)(5).

59.   The OMB Act thus implements the Constitutional Debt Priority Provision by giving secured debt such as the Authority Bonds and other obligations affecting the Commonwealth's "credit, reputation and good name" a priority senior to the payment of other expenses in a fiscal year in which available resources are not sufficient to pay all appropriations.

## III.   The Bankruptcy Code

60.   The Supreme Court has defined "bankruptcy" as the "subject of the relations between an insolvent or nonpaying or fraudulent debtor and his creditors, extending to his and their relief."  *Ry. Labor Executives' Ass'n v. Gibbons*, 455 U.S. 457, 466 (U.S. 1982) (citation and quotations omitted).  Congress' power under the Bankruptcy Clause of the United States Constitution (the "***Bankruptcy Clause***") "contemplates an adjustment of a failing debtor's obligations."  *Id*.  This power "extends to all cases where the law causes to be distributed, the property of the debtor among his creditors."  *Id*.  It "includes the power to discharge the debtor from his contracts and legal liabilities, as well as to distribute his property. The grant to Congress involves the power to impair the obligation of contracts, and this the States were forbidden to do."  *Id*.

61.   Bankruptcy is both a creditor's remedy and a debtor's right.  While one purpose of bankruptcy law is to provide a fresh start for the honest but unfortunate debtor, another primary purpose is to provide for equitable treatment of creditors in recovery of their claims. The Bankruptcy Code includes provisions that preserve the status quo, 11 U.S.C. § 362, thereby promoting equity of distribution among creditors.  The bankruptcy process further protects

creditors' rights by including provisions for determination of claims, *id*. § 502, establishing priorities, *id*. § 507, and requiring debtors to adequately protect the interests of secured creditors, *id*. §§ 361, 362, 363, 364.

62.     For over 70 years, the federal bankruptcy laws have contained a comprehensive regime for restructuring the debts of municipalities. *See* Act of August 16, 1937, 50 Stat. 653 (enacting original Chapter X of Bankruptcy Act dealing with municipal bankruptcy); *United States v. Bekins*, 304 U.S. 27 (1938) (upholding constitutionality of Chapter X). Those provisions are now codified in Chapter 9 of the Bankruptcy Code, 11 U.S.C. §§ 901 et seq., titled "Adjustment of Debts of a Municipality."  Congress first enacted this provision in 1946, and re-enacted it in 1976 and again in 1978, each time for the express purpose of ensuring that "[o]nly under a Federal law should a creditor be forced to accept such an adjustment without his consent." H.R. Rep. No. 79-2246, at 4 (1946); see also H.R. Rep. No. 94-686, at 19 (1975); S. Rep. No. 95-989, at 110 (1978).

63.     Specifically, chapter 9 of the Bankruptcy Code, 11 U.S.C. §§ 901 *et seq*., governs the adjustment of debts of a municipality.  A "municipality" includes an "instrumentality"—such as a public entity.  *Id*. § 101(40).

64.     Chapter 9 contains provisions specific to municipalities and also incorporates provisions from other chapters of the Bankruptcy Code.  *See* 11 U.S.C. § 901.  A municipality seeking to adjust its debts under Chapter 9 must file a plan with a bankruptcy court.  *See id*. § 941.  The bankruptcy court may make the plan binding on creditors by confirming it if, among other requirements, each impaired class of claims accepts the plan.  *See id*. §§ 944(a), 1129(a)(8). Once holders of at least two-thirds in amount and more than one-half in number of the allowed

claims of such a class held by creditors accept the plan, the class is deemed to have accepted the plan and the dissenting creditors are accordingly bound by it.  *Id*. § 1126(c).

65.     The bankruptcy court may also compel non-consenting creditors to be bound by a plan if it meets certain standards of fairness, regardless of creditor support.  *See* 11 U.S.C. §§ 944(a), 1129(b)(1), 1129(b)(2)(A)-(B).

66.     To support its debt-reduction regime, Chapter 9 of the Bankruptcy Code incorporates Bankruptcy Code provisions that automatically stay creditors' enforcement efforts during the pendency of the bankruptcy proceedings.  *See* 11 U.S.C. §§ 362, 922.

67.     Chapter 9 also incorporates a provision allowing municipalities to obtain credit while an automatic stay is in place.  *See* 11 U.S.C. § 364.  But where obtaining credit would require the debtor to provide senior liens on property or funds that have already been pledged as collateral for preexisting loans, the municipality must provide "adequate protection" to the preexisting creditors' interest.  *See id*. § 364.  Adequate protection includes cash payments, additional or replacement liens, and "such other relief…as will result in the realization by [the creditor] of the indubitable equivalent of [the creditor's] interest in" the property.  *Id*. § 361(3).

68.     Chapter 9 further incorporates provisions specifying the circumstances in which certain contracts may be abrogated, 11 U.S.C. § 365, declaring *ipso facto* clauses—clauses providing for default triggered by a bankruptcy filing, insolvency, or other specified event—are not enforceable, *id*. § 365(e), and providing for the formation of a creditors committee charged with representing creditors' interests during the bankruptcy, *see id*. §§ 1102-1103.

69.     In addition, Chapter 9 incorporates provisions of the Bankruptcy Code that prioritize creditors to ensure a fair distribution, 11 U.S.C. § 943(b)(7), permitting confirmation of a plan of adjustment only if "it is in the best interests of creditors and is feasible", providing

priority status for an entity extending credit to the debtor if a debtor is unable to obtain credit under other provisions of the Bankruptcy Code, *see id*. § 364(c)-(e), and requiring any distribution under a plan of adjustment to satisfy the priorities established under 11 U.S.C. § 507(a)(2).  *See also In re County of Orange*, 191 B.R. 1005, 1021 (Bankr. C.D. Cal. 1996) ("Chapter 9 does not permit individual states to override the priority scheme that is inherent in the Code. A uniform bankruptcy code necessitates that federal law control creditor priorities.").

70.     Only a "municipality," as defined by the Bankruptcy Code, may be a debtor under Chapter 9.  *See* 11 U.S.C. § 109(c).  While the Bankruptcy Code provides that the term "municipality" includes a public agency or instrumentality of a State, *see id*. § 101(40), the Code further provides that "for the purpose of defining who may be a debtor under chapter 9" the term "State" does not include the District of Columbia or Puerto Rico, *see id*. § 101(52).  In this way, Congress explicitly excluded municipalities, public agencies, and instrumentalities of the Commonwealth from bankruptcy protection.  However, except for this single, specific exception, Congress expressly defined the term "State" as including Puerto Rico, *see id*. § 101(52).

71.     The Bankruptcy Code specifically prevents States from exercising any authority to bind non-consenting creditors of municipalities.  *See* 11 U.S.C. § 903.  Because this provision does not involve who may be a debtor under Chapter 9 of the Bankruptcy Code, the term "State" in Section 903 includes Puerto Rico.  *See*  11 U.S.C. § 101(52).  Accordingly, Section 903 of the Bankruptcy Code bars Puerto Rico from binding non-consenting creditors of its municipalities just as it bars other States from binding non-consenting creditors of their municipalities.

72.     Although Congress deliberately excluded Commonwealth municipalities and instrumentalities from eligibility to be a debtor under Chapter 9, and although federal law preempts and bars bankruptcy protections and powers for its municipalities, the Constitutional

Debt Priority Provision, the OMB Act and the Executive Orders (a) purport to create a mechanism for the Commonwealth to adjust debts, to defer repayment and to decrease interest and principal owed by the Commonwealth's instrumentalities and public entities and to bind non-consenting creditors, (b) permit the Commonwealth to seize and use the Pledged Funds, without providing adequate protection, and (c) establish an overriding priority scheme to distribute the Pledged Funds, in contravention of binding contractual obligations and federal law.

73.     The Constitutional Debt Priority Provision authorizes the Commonwealth to "claw back" Pledged Funds if all other available resources for the relevant fiscal year are insufficient to pay the public debt, notwithstanding the obligations established by state and federal law and the agreements governing the Authority Bonds.   No provision in the Commonwealth Constitution provides for adequate protection for the Commonwealth's use of the "clawed back" Pledged Funds.   In the event the Governor "adjusts" or "claws back" the Pledged Funds, the corresponding obligations concerning the Authority Bonds are "canceled for the purposes of the year which has been adjusted".   23 L.P.R.A. § 104(d).   The OMB Act establishes an overriding priority scheme for distribution of the "clawed back" Pledged Funds. Further, the Governor purportedly may effectuate an adjustment by "restrict[ing] the funds available to the agencies, in whatever way he deems pertinent, when, in the execution and control of the budget, he considers it necessary" regardless of the "priority guidelines."   *See* 23 L.P.R.A. § 104(e)(5).

**IV.   The Constitutional Debt Priority Provision, The OMB Act And The Executive Orders Are Preempted By The Bankruptcy Clause And Bankruptcy Code**

74.     The United States Constitution provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or

Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2 (the "***Supremacy***

***Clause***").  Further, the Bankruptcy Clause of the United States Constitution provides that "[t]he

Congress shall have the Power … [t]o establish … uniform Laws on the subject of Bankrupticies

throughout the United States."  U.S. Const. art. I, § 8, cl. 4.  In accordance with the Bankruptcy

Clause, the United States Congress has enacted the Bankruptcy Code, 11 U.S.C. § 101 *et seq*.

75.    The efficacy of the Supremacy Clause is not tempered by the United States

Congress's ratification of a State's constitution.  *See Gunn v. Barry*, 82 U.S. 610, 623 (U.S.

1873) ("Congress cannot, by authorization or ratification, give the slightest effect to a State law

or constitution in conflict with the Constitution of the United States. That instrument is above

and beyond the power of Congress and the States, and is alike obligatory upon both.").  Indeed,

"a state statute is void to the extent it is in conflict with a federal statute."  *Rini v. United Van*

*Lines*, 104 F.3d 502, 504 (1st Cir. 1997).

76.    Under the Supremacy Clause, federal law may preempt state law in three ways.

First, Congress may state its intent through an express preemption statutory provision.  Second,

in the absence of explicit statutory language, state law is preempted where it regulates conduct in

a field that Congress intended the federal government to occupy exclusively.  Third, state law

that actually conflicts with federal law is preempted.

A.    **The Constitutional Debt Priority Provision, The OMB Act And The**
      **Executive Orders Are Expressly Preempted**

77.    Since 1946, Congress has expressly barred States from enacting nonconsensual

restructuring laws for their municipalities. *See* Act of July 1, 1946, Pub. L. No. 79-481, sec. 1, §

83(i), 60 Stat. 409, 415 ("***Section 83(i)***").  This prohibition applied to the Commonwealth from

the outset because the term "States" included "Territories and possessions." *See* Act of June 22,

1938, Pub. L. No. 75-696, sec. 1, § 1(29), 52 Stat. 840, 842. Congress incorporated Section

83(i)'s prohibition into the modern Bankruptcy Code "with stylistic changes" only, and thus the provision, re-codified as Section 903(1), continued to prevent "States [from] enact[ing] their own versions of Chapter 9 and thereby "frustrat[ing] the constitutional mandate of uniform bankruptcy laws." S. Rep. No. 95-989, at 110 (1978) (internal quotation marks omitted).

78.     Section 903(1) remains unchanged today, and by the Bankruptcy Code's plain terms, Puerto Rico remains a "State" for purposes of Section 903(1)'s bar. *See* 11 U.S.C. § 101(52) (Puerto Rico is a State in the Bankruptcy Code "except for the purpose of defining who may be a debtor under chapter 9").   Section 903(1) of the Bankruptcy Code provides: "[A] State law prescribing a method of composition of indebtedness of [a] municipality may not bind any creditor that does not consent to such composition." 11 U.S.C. § 903(1).   A "composition" is an "agreement between a debtor and two or more creditors for the adjustment or discharge of an obligation for some lesser amount."  *Franklin Cal. Tax-Free Trust v. Puerto Rico*, 85 F. Supp. 3d 577, 597 (D.P.R. 2015) (citation omitted).

79.     Accordingly, as laws of the Commonwealth, the Constitutional Debt Priority Provision, the OMB Act and the Executive Orders are expressly preempted by Section 903(1) of the Bankruptcy Code.  The Constitutional Debt Priority Provision authorizes the Commonwealth to "claw back" Pledged Funds if all other available resources for the relevant fiscal year are insufficient to pay the public debt and notwithstanding the obligations established by the relevant statutes and agreements governing the Authority Bonds.  This unilateral adjustment of the terms of the Authority Bonds necessarily alters the rights of FGIC and the Authority Bondholders.

80.     In the event the Governor "adjusts" or "claws back" the Pledged Funds, the corresponding obligations are "canceled for the purposes of the year which has been adjusted". 23 L.P.R.A. § 104(d).   The OMB Act further establishes an overriding priority scheme for

distribution of the "clawed back" Pledged Funds.  The Governor, however, claims the authority under the OMB Act to effect a permanent adjustment by "restrict[ing] the funds available to the agencies, in whatever way he deems pertinent, when, in the execution and control of the budget, he considers it necessary" regardless of the "priority guidelines."  *See* 23 L.P.R.A. § 104(e)(5).

81.     Thus, the Constitutional Debt Priority Provision, the OMB Act and the Executive Orders permit the Commonwealth and its instrumentalities and public entities to defer debt repayment obligations and to decrease interest and principal owed to creditors without the consent of creditors.   As procedures to adjust or discharge obligations to creditors, the Constitutional Debt Priority Provision and the OMB Act prescribe a method of composition of indebtedness without the consent of creditors, which is exactly what Section 903(1) prohibits.

**B.     Congress Exclusively Regulates The Field of Bankruptcy and Nonconsensual Restructuring Laws for Municipalities**

82.     The Constitutional Debt Priority Provision, the OMB Act and the Executive Orders are preempted because they improperly operate in a field that Congress has comprehensively occupied.  *See Int'l Shoe Co. v. Pinkus*, 278 U.S. 261, 265 (1929) ("States may not pass or enforce laws to interfere with or complement the Bankruptcy Act or to provide additional or auxiliary regulations."); *see also Sherwood Partners, Inc. v. Lycos, Inc.*, 394 F.3d 1198, 1201, 1203 (9th Cir. 2005); *In re Bank of New England Corp.*, 364 F.3d 355, 364 (1st Cir. 2004) (*citing Pinkus*, 278 U.S. at 265). Although the Bankruptcy Code "coexists peaceably with" certain state laws, *Sherwood Partners*, 394 F.3d at 1201, federal bankruptcy law "is pervasive" and "involves a federal interest so dominant as to preclude enforcement of state laws on the same subject," *id*. (internal quotation marks omitted). Thus, where a law operates "within the heartland of bankruptcy administration," it is preempted. *Id*.

83.    Despite those settled principles, the Constitutional Debt Priority Provision, the OMB Act and the Executive Orders purport to confer on the Commonwealth benefits that are integral to the Bankruptcy Code including, without limitation, (a) permitting the Commonwealth to modify debt obligations (e.g. by deferring payment) and force creditors to accept partial satisfaction of the underlying debt obligations, (b) establishing an overriding priority scheme for the benefit of certain classes of claimants set by the Legislative Assembly, and (c) permitting the Commonwealth to seize and use Plaintiff's collateral, i.e. the Pledged Funds, via the "claw back" without providing adequate protection.

84.    The Constitutional Debt Priority Provision, the OMB Act and the Executive Orders trespass on Congress's comprehensive regulatory framework for the field of coercive municipal-debt restructuring. Chapter 9 establishes a comprehensive regulatory scheme for the "Adjustment of Debts of a Municipality." 11 U.S.C., ch. 9 (title).   The Constitutional Debt Priority Provision, the OMB Act and the Executive Orders permit the Commonwealth and its public entities to defer debt repayment obligations and to decrease interest and principal owed to creditors without the consent of creditors, and thus indisputably enter an area where the "federal interest" is "dominant." *Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012) (internal quotation marks omitted).

85.    Inasmuch as the Constitutional Debt Priority Provision, the OMB Act and the Executive Orders purport to enable the Commonwealth and its municipalities to force creditors to accept debt restructurings in a manner similar to Chapter 9, they unquestionably provide "additional or auxiliary regulations" on bankruptcy matters. *Pinkus*, 278 U.S. at 265.

86.    To be sure, in 1942 the Supreme Court held that the field of municipal bankruptcy had not *yet* been preempted by then-nascent federal municipal-bankruptcy law. *Faitoute Iron &*

*Steel Co. v. City of Asbury Park*, 316 U.S. 502, 508-09 (1942). But in 1946, Congress made municipal bankruptcy a permanent feature of federal law and simultaneously enacted Section 83(i) to prohibit state laws from adjusting the debts of municipalities owed to nonconsenting creditors. Congress thereby established that the realm of binding compositions of municipal debt would henceforth be the exclusive domain of federal law.  Indeed, this Court has previously held that, "by enacting section 903(1), Congress expressly preempted the field of municipal composition procedures that bind nonconsenting creditors."  *Franklin Cal. Tax-Free Trust v. Puerto Rico*, 85 F. Supp. 3d 577, 601-602 (D.P.R. 2015).

### C.   The Constitutional Debt Priority Provision, The OMB Act And The Executive Orders Conflict With The Bankruptcy Code

87.   The Constitutional Debt Priority Provision, the OMB Act and the Executive Orders are preempted because they conflict with the federal Bankruptcy Code. *See, e.g., Chi. Title & Trust Co. v. Forty-One Thirty-Six Wilcox Bldg. Corp*., 302 U.S. 120, 126 (1937) ("state laws in conflict with the laws of Congress on the subject of bankruptcies are suspended . . . to the extent of actual conflict with the system provided by" federal bankruptcy law (citation omitted)); *Pinkus*, 278 U.S. at 263-64 ("A state is without power to make or enforce any law governing bankruptcies that impairs the obligation of contracts or extends to persons or property outside its jurisdiction or conflicts with the national bankruptcy laws."); *Sturges v. Crowninshield*, 17 U.S. 122, 195-97 (1819).

88.   As explained above, Section 903(1) of the Bankruptcy Code prohibits state laws that create composition procedures for indebted municipalities that bind nonconsenting creditors, and the Constitutional Debt Priority Provision, the OMB Act and the Executive Orders are each such a law.  As an example of conflict: the Constitutional Debt Priority Provision, the OMB Act and the Executive Orders provide that the Commonwealth may "claw back" Pledged Funds even

though the Pledged Funds are already subject to the Authority Bondholders' and FGIC's prior interest—and that the Commonwealth may do so without any adequate protection for such prior interest in the Pledged Funds—if, among other things, the proceeds are needed to satisfy the "priority guidelines." The Constitutional Debt Priority Provision, the OMB Act and the Executive Orders authorize the Commonwealth to seize Authority Bondholders' and FGIC's collateral securing the Authority Bonds for the purpose of securing additional lending for itself.

89.     The Bankruptcy Code, however, precludes the grant of a superior lien unless there is "adequate protection" for existing liens. 11 U.S.C. § 364(d)(1). A grant of a superior lien on property that is already subject to a lien without adequate protection to existing lienholders, as authorized by the Constitutional Debt Priority Provision, the OMB Act and the Executive Orders, would violate the Bankruptcy Code. The Constitutional Debt Priority Provision, the OMB Act and the Executive Orders effectively empower the Commonwealth to expropriate private property for no compensation (and no adequate protection) when it asserts the need to do so.

90.     As another example of conflict: In the Bankruptcy Code, Congress provided that only a "municipality" authorized to be a debtor by State law or a State authority may be a "debtor" for purposes of Chapter 9. 11 U.S.C. § 109(c). "Municipality," in turn, is defined as a "political subdivision . . . or instrumentality of a State." *Id*. § 101(40).  Congress provided that the term "State" includes Puerto Rico in all circumstances, except it specifically provided that "State" does not include Puerto Rico (or the District of Columbia) "for the purpose of defining who may be a debtor under chapter 9." *Id*. § 101(52). In this way, Congress explicitly withheld from Puerto Rico municipalities the ability to be a Chapter 9 debtor. *See* 2 Collier on Bankruptcy ¶ 101.52 (2014). Given that municipalities may not be debtors under any other chapter of the

-27-

Bankruptcy Code, *see* 11 U.S.C. § 109, this definition represents Congress's considered judgment to exclude Puerto Rico municipalities from participating in a bankruptcy regime.

91.    The Constitutional Debt Priority Provision, the OMB Act and the Executive Orders are also preempted because their debt adjustment procedures stand as an obstacle to accomplishing and executing Congress's purposes and objectives in enacting a uniform bankruptcy code. *See, e.g., Sherwood Partners*, 394 F.3d at 1201; *see also Pinkus*, 278 U.S. at 265 ("The power of Congress to establish uniform laws on the subject of bankruptcies throughout the United States is unrestricted and paramount. The purpose to exclude state action for the discharge of insolvent debtors may be manifested without specific declaration to that end; that which is clearly implied is of equal force as that which is expressed." (citation omitted)). The Constitutional Debt Priority Provision, the OMB Act and the Executive Orders provide differing and competing standards for, among other things, priorities among claimants, use of collateral and adequate protection and the abrogation of contractual obligations.  The existence of a separate, Commonwealth-specific system for adjusting the debts of municipalities undermines the uniformity of the federal scheme, particularly given that Congress specifically determined that Commonwealth municipalities should not be permitted to participate in a bankruptcy scheme. *See* 11 U.S.C. §§ 101(40), (52); 109(c).

92.    Accordingly, the Constitutional Debt Priority Provision, the OMB Act and the Executive Orders conflict with—and are therefore preempted by—the Bankruptcy Code because they frustrate Congress's undeniable purpose in enacting Section 903(1) of the Bankruptcy Code, i.e. "Congress quite plainly wanted a single federal law to be the sole source of authority if

municipal bondholders were to have their rights altered without their consent." *Franklin Cal. Tax-Free Trust v. Puerto Rico*, 805 F.3d 322, 343 (1st Cir. 2015).[1]

## V.     The Executive Orders Are Unconstitutional

93.     Even if the Constitutional Debt Priority Provision, the OMB Act and the Executive Orders are not preempted, the Executive Orders are unconstitutional because (a) they substantially and unjustifiably impair the contractual rights of Plaintiff and of the Authority Bondholders and (b) they constitute an intentional and arbitrary misappropriation and diversion of secured bondholder collateral that has and will deprive FGIC and the Authority Bondholders of their lawful property interests in and due process rights with respect to the Pledged Funds in violation of the Takings Clause, the Due Process Clauses and the Equal Protection Clause.

### A.     Puerto Rico Statutes Clearly Limit When And How Pledged Funds May Be Used To Pay Public Debt

94.     In furtherance of the Constitutional Debt Priority Provision, the Legislative Assembly placed clear limitations on *when* and *how* certain funds could be used to pay public debt.

95.     Specifically, the laws under which the Authority Bonds have been issued (the "***Authority Bond Priority Provisions***" and, together with the Constitutional Debt Priority Provision, the "***Debt Priority Provisions***") permit the Pledged Funds to be "clawed back" to pay the public debt in a fiscal year in which the Public Debt Priority is in effect, but only when a particular precondition is satisfied, namely only when *all other* available resources for the relevant fiscal year are insufficient to pay the public debt (such a use of Pledged Funds to pay the public debt, a "***Clawback***").

---

[1] On December 4, 2015, the Supreme Court granted the petition for writ of certiorari to the United States Court of Appeals and consolidated the cases. *See Puerto Rico v. Franklin Cal. Tax-Free Trust*, 193 L. Ed. 2d 465 (U.S. 2015).

96.    The laws under which the Authority Bonds were issued also place a precondition on how Pledged Funds that are subject to Clawback may be used. Specifically, Pledged Funds that are clawed back may be used solely to pay "public debt," and may not be used to pay other expenses.

97.    Together, these two preconditions to any Clawback establish the priority (the "*Authority Bond Priority*") of the Authority Bonds over *all* disbursements other than public debt that might be made during a fiscal year in which the Public Debt Priority is in effect.

98.    The Authority Bond Priority, including these two preconditions to any Clawback, is expressly set forth in each of the statutes under which the Authority Bonds were issued, as follows:

    (a)    <u>Excise Taxes Pledged to Payment of PRHTA Bonds</u>: "The proceeds of said collection shall be solely used for the payment of interest and amortization of the public debt, as provided in said Section 8 of Item VI of the Constitution, to the extent that all other resources available to which reference is made in said section are insufficient for such purposes. Otherwise, the proceeds of said collection, in the amount that may be necessary, shall be used solely for the payment of the principal and interest on bonds and other obligations of the Authority and to comply with any stipulations agreed to by the latter with the holders of said bonds or other obligations." 13 L.P.R.A. § 31751(a)(1)(B) (emphasis added).

    (b)    <u>Vehicle Fees Pledged to Payment of PRHTA Bonds</u>: "[S]aid pledge or pignoration shall be subject to the provisions of § 8 of Article VI of the Constitution of Puerto Rico; Provided, however, That the proceeds of said collection shall only be used for the payment of interest and the amortization of the public debt, as provided in said § 8, to the extent that all other resources available, referred to in said section, are insufficient for such purposes, otherwise, the proceeds of said collection in the amount that is necessary shall be used solely for the payment of the principal and interest on bonds and other obligations of the Authority, and to meet whatever other stipulations are agreed upon between the Authority and the holders of said bonds or other obligations." 9 L.P.R.A. § 2021 (emphasis added); *see also* 9 L.P.R.A. § 5681.

    (c)    <u>PRCCDA Pledged Funds Pledged to Payment of PRCCDA Bonds</u>: "The product of the collection of the tax shall be used solely for the payment of the interest and the amortization of the public debt, as provided in Section

-30-

8 of Article VI of the Constitution of the Commonwealth of Puerto Rico, but only to the degree to which the other available resources to which reference is made in said Section are insufficient for such purposes. Otherwise, the product of said collection, in the amount necessary, shall be used solely for the payment of the principal and interest on the bonds, notes or other obligations and the obligations under any bond related financing agreement contemplated herein, and to comply with any stipulations agreed to with the bondholders, noteholders or holders of other obligations or the providers under bond related financing agreements." 13 L.P.R.A. § 2271v (emphasis added).

(d) **PRIFA Pledged Funds Pledged to Payment of PRIFA Bonds:**
"[PRIFA] is hereby empowered to segregate a portion of said Funds into one (1) or more sub-accounts, subject to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico for the payment of the principal and interest on bonds and other obligations of the Authority, or for the payment of bonds and other obligations issued by a benefited entity, or for any other legal purpose of the Authority. **The moneys of the Special Fund may be used for the payment of interest and for the amortization of the public debt of the Commonwealth, as provided in said Section 8, only when the other resources available referred to in said Section are insufficient for such purposes."** 3 L.P.R.A. § 1914 (emphasis added).

99.     The Authority Bond Priority is also clearly stated in disclosure documents issued by the Authorities and used to publicly offer their debt securities to investors and on which Plaintiff relied when it issued each of the insurance policies for the Authority Bonds. For example, the following disclosure documents clearly state the Authority Bond Priority:

(a) **Official Statement for PRHTA Series AA Refunding Bonds (July 1, 2010), at 19:** " The proceeds of the gasoline tax, the gas oil and diesel oil tax, the petroleum products tax and the motor vehicle fees allocated to [PRHTA] by the Puerto Rico Internal Revenue Code and Act No. 9 are available Commonwealth resources under the Constitution. Accordingly, if needed, they are subject to being applied first to the payment of debt service on the public debt of the Commonwealth. However, under the Puerto Rico Internal Revenue Code and Act No. 9, **such taxes and license fees are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth are insufficient for such purpose."**

(b) **Official Statement for PRCCDA Hotel Occupancy Tax Revenue Bonds, Series A, at 22:** "Hotel Occupancy Tax revenues are available revenues under the Constitution. Accordingly, if needed, they may be

applied first to the payment of debt service on the public debt of the Commonwealth. Under the [PRCCDA] Enabling Act, the Hotel Occupancy Tax Act and the Constitution of the Commonwealth, however, **such revenues are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth are insufficient for such purpose.**"

(c) **Official Statement for PRIFA Special Tax Revenue Bonds, Series 2005A-C, at 10:** "Prior to their application to pay principal of and interest on the Bonds, the Special Tax Revenues are available revenues under the Constitution. Accordingly, if needed, they are subject to being applied first to the payment of debt service on the public debt of the Commonwealth. Under the [PRIFA] Enabling Act, however, **such revenues are to be used for such payments only if and to the extent that all other available revenues of the Commonwealth under the Constitution are insufficient for such purpose.**"

100.    Notably, the offering documents for the Commonwealth's "public debt" also acknowledge and disclose the Authority Bond Priority:

(a) **Official Statement for Commonwealth of Puerto Rico General Obligation Bonds of 2014, Series A, at 16:** "[A]lthough certain revenues assigned to [PRHTA], Puerto Rico Infrastructure Financing Authority ('PRIFA') and Puerto Rico Convention Center District Authority ('PRCCDA') are stated by existing law to be available Commonwealth resources for purposes of the payment of public debt, their availability for such purpose is **subject to there being no other available Commonwealth resources.**"

(b) **Official Statement for Commonwealth of Puerto Rico General Obligation Bonds of 2014, Series A, at 29-30:** "The Commonwealth has also assigned certain revenues to [PRHTA], PRIFA, and PRCCDA. These consist of (i) motor vehicle fuel taxes, crude oil and derivative products excise taxes, cigarette excise taxes and license fees allocated to [PRHTA]; (ii) federal excise taxes imposed on alcoholic beverages and tobacco products produced in Puerto Rico and sold in the United States, which taxes are returned by the federal government to the Commonwealth and allocated to PRIFA; and (iii) hotel occupancy taxes imposed by hotels on paying guests, which are allocated to PRCCDA. Although the legislation provides that the assigned taxes and fees are subject to first being applied to the payment of the principal of and interest on the Commonwealth public debt, **their application to the payment of public debt is effective only if and to the extent that all other available Commonwealth resources are insufficient for that purpose.**"

101.    Accordingly, the plain language of both the Constitutional Debt Priority Provision and the Authority Bond Priority Provisions demonstrates that the purpose of the Clawback is to provide an additional source of payment for the public debt only when all other available resources for an entire fiscal year are insufficient for that purpose and *not* to provide an additional source from which the Commonwealth can fund government operations or other expenditures.  *See, e.g.*, 13 L.P.R.A. § 31751(a)(1)(B) (cited above); 9 L.P.R.A. § 2021 (cited above); 9 L.P.R.A. § 5681; 13 L.P.R.A. § 2271v (cited above).

102.    In the Commonwealth's quarterly financial report dated November 6, 2015, the Commonwealth stated, and thus admitted, that the Authority Bonds are subject to Clawback only when and if there are no other available resources, thus re-affirming the validity of the Authority Bond Priority:

> Certain revenues assigned to Puerto Rico Highways and Transportation Authority, Puerto Rico Infrastructure Financing Authority and Puerto Rico Convention Center District Authority are stated by existing law to be available Commonwealth resources for purposes of the payment of public debt. **However, their availability for such purpose is subject to there being no other available Commonwealth resources.**

Commonwealth of Puerto Rico, *Financial Information and Operating Data Report*, Nov. 6, 2015, at 45 (emphasis added).

### B.    The First Executive Order

103.    The Governor issued Administrative Bulletin No. OE-2015-046 (the "***First Executive Order***") on November 30, 2015, the day before a debt service payment was due on public debt. A true and correct copy of the First Executive Order is attached hereto as Exhibit B. The First Executive Order directs the Puerto Rico Department of Treasury (the "***Department of Treasury***") to withhold the PRHTA Pledged Funds and the PRIFA Pledged Funds for application to the public debt instead of releasing such Pledged Funds to PRHTA and to PRIFA for application to the PRHTA Bonds and the PRIFA Bonds. The First Executive Order also

-33-

directs the Puerto Rico Tourism Company to transfer the PRCCDA Pledged Funds to the Department of Treasury for application to the public debt instead of releasing the PRCCDA Pledged Funds for application to the PRCCDA Bonds.

104.    According to the First Executive Order, the Public Debt Priority is in effect for Fiscal Year 2016 because there are insufficient funds to pay all appropriations and so public debt must be given priority pursuant to the Constitutional Debt Priority Provision. However, the First Executive Order impairs the Public Debt Priority, because the First Executive Order expressly provides for other expenses to be paid "at the same time" ("a su vez") as the public debt.  *See* Exhibit B at 2. By contrast, the Public Debt Priority requires the public debt to be paid "first," and not at the same time as other expenses.  *See* P.R. Const. art. VI, § 8.

105.    The First Executive Order also impairs the Authority Bond Priority, because the "Whereas" clauses in the First Executive Order indicate that the Commonwealth has funded and continues to fund general "expenses" ("los gastos") *other* than payments on the Authority Bonds. *See* Exhibit B at 2. Pursuant to the Authority Bond Priority, the Authority Bonds enjoy priority over these other expenses. Accordingly, the public debt could (and should) be paid from the resources used to pay these other "expenses," not from the Pledged Funds.

106.    The First Executive Order attempts to disguise its obvious impairment of the Authority Bond Priority by providing that the Pledged Funds will be "remitted" to the Authorities for the payment of the Authority Bonds to the extent it is "not necessary" to use all of the clawed-back funds to pay the public debt: "If it is not necessary to use all the funds withheld, they will be remitted to the corresponding public corporations [including the Authorities] for the payment of their respective obligations." ("Si no fuera necesario utilizar todos los fondos retenidos, se remitirán a la corporación pública applicable para el pago de sus respectivas

obligaciones.").  *See* Exhibit B at 3. Through this statement in the First Executive Order, the Governor acknowledges the validity of the Authority Bond Priority by providing that the Pledged Funds may not be used to pay any expenses subordinate to the Authority Bonds, and instead may only be used to pay the public debt. However, this provision of the First Executive Order assumes that the determination of whether it is "necessary" to use Pledged Funds to pay the public debt will be made only *after* certain expenditures *other than payment of the public debt* have been made. Accordingly, the First Executive Order effectively authorizes the Defendants to first make these other general expenditures, and only then to consider whether sufficient resources remain to pay the public debt without clawing back the Pledged Funds. The effect of the First Executive Order is thus to elevate all these general expenditures to a priority position *ahead of* the Authority Bonds, which again is an impairment of the Authority Bond Priority. Moreover, this elevation of general expenditures permits use of the Clawback—which is available *solely* for payment of public debt—for the payment of other expenditures.

### C.    The Second Executive Order

107.    On December 8, 2015, the Governor issued Administrative Bulletin OE-2015-49 (the "***Second Executive Order***"), which seeks to implement the First Executive Order. A true and correct copy of the Second Executive Order is attached hereto as Exhibit C.

108.    Purportedly pursuant to the OMB Act, the Second Executive Order first authorizes the OMB Director to adjust the allocations in the Commonwealth's Fiscal Year 2016 budget to the Commonwealth's "available resources," including the Pledged Funds withheld pursuant to the First Executive Order. *See* Exhibit C at 3. Permitting the OMB Director to include Pledged Funds in these budgetary adjustments (the "***Budgetary Adjustments***") constitutes an impairment of the Authority Bond Priority, because the preconditions to a

Clawback have not been satisfied and Pledged Funds should thus not be available for any purpose other than payment of the Authority Bonds.

109.    Furthermore, in making the Budgetary Adjustments, the Second Executive Order requires the OMB Director to be guided by the "priority guidelines" set forth in Section 4(c) of the OMB Act, but "*with the purpose of maintaining essential services and to ensure the good operation of the Government of the Commonwealth of Puerto Rico.*" Exhibit C at 3 (emphasis added). This stated purpose of the Budgetary Adjustments in fact constitutes a modification of the OMB Act's "priority guidelines," which require payment of public debt and of other obligations affecting the "credit, reputation and good name of the Government of the Commonwealth of Puerto Rico" *prior to* the funding of general expenditures. The Budgetary Adjustments thus impair the Authority Bond Priority.

110.    Next, the Second Executive Order authorizes the Working Group to establish guidelines (the "***Working Group Guidelines***") in consultation with the Secretary of Treasury to manage the Commonwealth's cash flow and to make disbursements of the funds available for Fiscal Year 2016, including the Pledged Funds. *See* Exhibit C at 3. The Working Group Guidelines are to take into consideration, among other things, the Budgetary Adjustments made by the OMB Director, which Budgetary Adjustments, as described above, assume (i) the availability of the Pledged Funds, notwithstanding the fact that the preconditions to a Clawback have not been satisfied, and (ii) the priority of general expenditures over payment of the public debt, notwithstanding the Public Debt Priority. *See id*.

111.    The Second Executive Order next authorizes the Secretary of Treasury to manage the Commonwealth's cash flow and to make disbursements from the Commonwealth's available resources for Fiscal Year 2016, which available resources are assumed to include the Pledged

Funds withheld pursuant to the First Executive Order, in accordance with the Working Group Guidelines. *See id*.

112.    Finally, the Second Executive Order instructs the Agency Heads to prioritize spending in their agencies in accordance with the Budgetary Adjustments and the Working Group Guidelines. *See id*.

113.    On December 17, 2015, the Sub-Secretary partially implemented the Second Executive Order by issuing the First Circular Letter, which sets forth the Working Group Guidelines. A true and correct copy of the First Circular Letter is attached hereto as Exhibit D. After excluding certain federal funds, the Working Group Guidelines as set forth in the First Circular Letter provide for the public funds of the Commonwealth central government (including the Pledged Funds withheld pursuant to the First Executive Order) to be disbursed in the following order of priority:

(a)    Interest and amortization of the public debt under the Constitution, according to the due date.

(b)    Final and unappealable judgments issued by courts in cases of eminent domain, for which an appropriation was made during Fiscal Year 2016.

(c)    Expenses necessary to guarantee the following essential services:

i.    Public Health

ii.    Safety

iii.    Education

iv.    Public welfare

(d)    Payroll and pension expenses, including all related contributions and retentions.

(e)    Income under government custody belonging to external entities, such as, but without limitation to, the Compulsory Insurance, the Administration for the Compensation of Automobile Accidents ("ACAA"), refunds, among others.

    (f)      Any other expense previously contemplated that in the discretion of the Secretary of the Treasury is necessary to guarantee the operation, continuity and stability of the central Government of the Commonwealth of Puerto Rico, such as those necessary to guarantee the well-being of the citizens.

    (g)      In case there is an emergency caused by a catastrophe, acts of nature, fortuitous accidents, or that in any way impact the security, health, education, and well-being of the citizenry, priority will be given to the expenditures necessary for the execution of that which better responds to the return to normal life and economy of the Commonwealth.

114.    The Working Group Guidelines as set forth in the First Circular Letter do not provide for application of the Pledged Funds to the Authority Bonds, notwithstanding the fact that the preconditions to a Clawback have not been satisfied. In fact, the Working Group Guidelines omit entirely the payment of "commitments entered into by virtue of legal contracts in force" and the payment of "binding obligations to safeguard the credit, reputation and good name of the Government of the Commonwealth of Puerto Rico," notwithstanding the fact that such commitments and obligations are entitled to a priority second only to the public debt under Section 4(c) of the OMB Act. *See* 23 L.P.R.A. § 104(c)(2).

115.    In sum, the Second Executive Order, including as partially implemented through the First Circular Letter, impairs the Authority Bond Priority by authorizing the OMB Director, the Working Group Members, the Secretary of Treasury, the Sub-Secretary, and the Agency Heads to prioritize general expenditures over payment of other obligations affecting the "credit, reputation and good name of the Commonwealth of Puerto Rico" (including the Authority Bonds).

116.    Accordingly, the Second Executive Order impairs the Authority Bond Priority by (i) assuming a Clawback of Pledged Funds notwithstanding the fact that the preconditions to a Clawback have not been satisfied and (ii) authorizing the OMB Director, the Working Group

Members, the Secretary of Treasury, the Sub-Secretary, and the Agency Heads to prioritize general expenditures over payment of the Authority Bonds.

### D.   The Executive Orders Have Injured FGIC

117.   The Defendants' diversion of the Pledged Funds from the payment of the Authority Bonds has caused and will cause further injury to FGIC and to the Authority Bondholders, because it reduces the amount of Pledged Funds securing the payment of the Authority Bonds. This unconstitutional diversion of Pledged Funds has already caused a default with respect to a $35.941 million interest payment due on PRIFA Bonds on January 1, 2016, requiring FGIC to make payments in respect of at least $6,393,666 of claims submitted under FGIC's insurance policy insuring certain of the defaulted PRIFA Bonds. If the unconstitutional diversion of Pledged Funds is permitted to continue without the replenishment of the diverted funds, the inevitable result will be further defaults on the Authority Bonds, including those bonds insured by FGIC.[1]

118.   Furthermore, whether as a result of claims of sovereign immunity or an alleged inability to pay any award of damages, FGIC and the Authority Bondholders have no adequate remedy at law against the Defendants in the event that the Defendants' unconstitutional diversion of the Pledged Funds results in further payment defaults on the Authority Bonds. Accordingly, the only recourse that is available to FGIC and to the Authority Bondholders in order to prevent an irreparable injury is to obtain injunctive relief enjoining the Defendants' unconstitutional diversion of the Pledged Funds *prior* to the time that this unconstitutional diversion results in further defaults.

---

[1] The question of the Commonwealth's constitutional status as a sovereign is currently pending before the United States Supreme Court. *See Puerto Rico v. Sanchez Valle*, 136 S. Ct. 28 (2015) (No. 15-108). Accordingly, Plaintiff expressly reserves the right to assert additional rights, claims, and remedies, whether under federal or Commonwealth law, as a result of the Supreme Court's ruling in *Sanchez Valle*.

119.    The Governor himself has acknowledged that the "clawback" of Pledged Funds pursuant to the First Executive Order is tantamount to a default on the Authority Bonds and that the "clawback" was instituted to pay expenses that are expressly subordinated by law to the Authority Bonds. In his December 1, 2015 "Written Testimony" to the U.S. Senate Committee on the Judiciary, the Governor made the following statement regarding the First Executive Order:

> In light of the rapidly deteriorating revenue situation, in accordance with Article 6, Section 8 of the Constitution of the Commonwealth of Puerto Rico, I ordered the "clawback" of revenues assigned to certain instrumentalities of the Commonwealth for the repayment of their debts. Together these instrumentalities have approximately $7 billion in bonds outstanding. **In simple terms, we have begun to default on our debt** in an effort to attempt to repay bonds issued with the full faith and credit of the Commonwealth and **secure sufficient resources to protect the life, health, safety and welfare of the people of Puerto Rico**.

*Puerto Rico's Fiscal Problems: Examining the Source and Exploring the Solution: Hearing Before the S. Comm. on the Judiciary*, Dec. 1, 2015 (Written Testimony of Alejandro J. García Padilla) (emphasis supplied). By the Governor's own admission, the issuance of the First Executive Order has caused a "default" on the Authority Bonds and present injury to Authority Bondholders and to FGIC as insurer of certain of those bonds. The issuance of the Second Executive Order, which implements the First Executive Order, has only exacerbated that injury.

**E.    The Executive Orders Violate The Contracts Clause**

120.    The Contracts Clause of Article I of the United States Constitution provides, in pertinent part, "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." U.S. Const., art. I, § 10, cl. 1. The primary purpose behind the enactment of the Contracts Clause was to prevent States from adopting laws that would permit borrowers (including the States) to abrogate their debts at the expense of creditors. *See, e.g., Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 427-28 (1934); *Antoni v. Greenhow*, 107 U.S. 769, 795 (1883).

121.    The Executive Orders substantially impair the contractual rights of the Authority Bondholders and of FGIC. The Authority Bondholders purchased the Authority Bonds (and FGIC issued its insurance policies for those bonds) in reliance on the Authorities' promise to pledge certain funds exclusively to the payment of the Authority Bonds, subject only to the Debt Priority Provisions. These priorities were incorporated into the Authorities' contracts with the Authority Bondholders and with FGIC. However, by (i) altering these priorities and (ii) diverting Pledged Funds from their contractually agreed upon purposes, the Executive Orders substantially impair the contractual rights of the Authority Bondholders and FGIC to be secured by, and ultimately paid from, the Pledged Funds.

122.    In issuing the Executive Orders, the Governor purported to be exercising the Commonwealth's police power. *See, e.g.*, Exhibit B at 2 ("The Commonwealth of Puerto Rico has the responsibility and the duty to ensure the health, safety, education and public welfare of its people through the exercise of its police power.").

123.    The police power to "enact laws for the protection of the life, health and general welfare of the people" is a legislative power. *See, e.g.*, P.R. Const. art. II, § 19 ("The power of the Legislative Assembly to enact laws for the protection of the life, health and general welfare of the people shall likewise not be construed restrictively."). In issuing the Executive Orders, the Governor was exercising a legislative power, and the Executive Orders constitute legislative acts that modify existing Commonwealth law, including the Debt Priority Provisions.

124.    The Executive Orders cannot be justified as a valid exercise of the Commonwealth's police power, because the police power cannot override constitutional limitations. *See, e.g., Flushing Nat'l Bank v. Mun. Assistance Corp. for N.Y.*, 358 N.E.2d 848,

852 (N.Y. 1976) (holding that a "fugitive recourse to the police power" may not be used to "displace inconvenient but intentionally protective constitutional limitations").

125.    In addition, the power to establish a budget is among the most important functions of the Legislative Assembly.

126.    Through the OMB Act, however, the Legislative Assembly delegated to the Governor the power to make adjustments to the Commonwealth's budget by acting "according to [specific] priority guidelines for the disbursement of public funds" when there are insufficient funds to pay all appropriations for a particular fiscal year. *See* 23 L.P.R.A. § 104(c).

127.    The Governor's issuance of the Executive Orders thus constitutes the exercise of a legislative power delegated to the Governor by the Legislative Assembly.

128.    The Defendants' confiscation and diversion of Pledged Funds pursuant to the Executive Orders is not a necessary or reasonable means of serving an important public purpose, because less drastic alternatives were available that would not have entailed an impairment of the Authority Bond Priority.

129.    As revealed in recent Congressional testimony, the Commonwealth has many more reasonable tools at its disposal to address its fiscal and economic challenges, rendering the "clawback" unnecessary.  *See Puerto Rico's Fiscal Problems: Examining the Source and Exploring the Solution: Hearing Before the S. Comm. on the Judiciary*, Dec. 1, 2015 (Written Testimony of Stephen J. Spencer) ("***Spencer Written Testimony***").

130.    Specifically, the Commonwealth still has significant capacity to raise revenues. In a comprehensive analysis of the Commonwealth's tax structure, KPMG, the Commonwealth's own outside tax consultant, found that Puerto Rico's tax as a percent of GDP burden was far lower than comparable U.S. States. *See* Spencer Written Testimony at 9. Further analysis also

reveals that the Commonwealth's tax burden as a percent of GDP is far lower than all U.S. States. *Id*. Additionally, as noted above, the Commonwealth Constitution actually requires the Legislative Assembly to raise taxes in the event appropriations for a given fiscal year exceed estimated resources, as the First Executive Order states is now the case.  *See* P.R. Const. art. VI, § 7.

131.    The Commonwealth can significantly improve revenue collections. *See* Spencer Written Testimony at 10. The analysis undertaken by the Commonwealth's tax consultant, KPMG, concluded that by improving tax collections and simplifying the Commonwealth's tax structure, net revenue collections could be improved by more than $3.6 billion annually. *Id*. The size of the incremental revenue collections opportunity stems from a system of taxation that KPMG found is plagued by "structural complexity, instability, internal inconsistency, inefficient administration and inadequate enforcement." *Id*. KPMG also noted that revenue collections were hindered by a "culture of tax evasion." *Id*. Further highlighting the extent of the incremental revenue opportunity, the Commonwealth was found to collect less than 60% of sales taxes owed, to have a large number of high income filers who pay no income tax at all, and to be collecting property taxes off a base that was in some cases last assessed in the 1950s. *Id*.

132.    Perhaps most importantly, the Commonwealth can reduce costs.  *See* Spencer Written Testimony at 10. Although the Commonwealth has recently attempted to limit the growth in government spending, consolidated government expenditures have still increased 47% over the past 10 years. *Id*. The Governor's recent Fiscal and Economic Growth Plan identifies a number of sensible cost reduction opportunities.  *Id*.

133.    Indeed, the Second Executive Order illustrates precisely the types of measures the Governor could have taken—and was *required by law* to take—in response to any alleged

shortfall of "available resources" during Fiscal Year 2016. Specifically, the Governor, assisted as needed by the OMB Director, the Working Group, and the Secretary of Treasury, should have adjusted budgeted allocations downward in order to bring them in line with actual available resources, just as the Second Executive Order purports to authorize the OMB Director to do. In making these budgetary adjustments, however, the Governor should have complied with the "priority guidelines" set forth in Section 4(c) of the OMB Act by first reducing the amounts allocated to the lowest priority items, such as commitments contracted by the Commonwealth under special appropriations and the construction of capital works. See 23 L.P.R.A. § 104(c)(4)-(5).

134.    Notably, even excluding the Pledged Funds, the projected resources available to the Commonwealth for Fiscal Year 2016 (approximately $9.0 billion) vastly exceed debt service on the public debt (approximately $1.87 billion). The Governor had significant room to reduce lower-priority expenditures without significantly impacting high-priority items such as public health and safety, and without resorting to a "clawback" of Pledged Funds. *See* 23 L.P.R.A. § 104(c)(3)(A)-(B). Given the clarity with which the Legislative Assembly has set forth the procedure that the Governor should follow in a year in which available resources fall short of appropriations, the Governor and the other Defendants cannot demonstrate that any other means of addressing an alleged budget shortfall was "necessary" and "reasonable" to serve an important public purpose.

135.    In short, the Executive Orders constitute neither a reasonable nor a necessary means of serving an important public purpose, because many less drastic alternatives existed, and the ultimate effect of the Executive Orders will only be to impede a consensual resolution to the Commonwealth's debt problems, to limit the Commonwealth's access to the capital markets,

to deepen the Commonwealth's long-term financial difficulties, and to endanger the long-term health and safety of the people of Puerto Rico.

> **F.** **The Executive Orders Violate The Takings Clause, The Due Process Clauses, The Equal Protection Clause; Declaratory And Injunctive Relief Sought Pursuant To 42 U.S.C. § 1983**

136.    The Takings Clause of the Fifth Amendment to the United States Constitution provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause applies to the States, and the Commonwealth, by virtue of Section 1 of the Fourteenth Amendment to the United States Constitution. U.S. Const. amend. XIV, § 1.

137.    The Due Process Clauses of the Fifth and Fourteenth Amendments to the United States Constitution forbid the Commonwealth from depriving "any person . . . of life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV, § 1.

138.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution forbids the Commonwealth from denying "any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

139.    The Executive Orders violate the Takings and Due Process Clauses by depriving FGIC and Authority Bondholders of their senior secured property interests in the Pledged Funds without providing FGIC and Authority Bondholders with due process or with just compensation. Because the Debt Priority Provisions provide no legal basis for the Governor or the other Defendants to deprive FGIC or the Authority Bondholders of their property interests in the Pledged Funds, the Executive Orders constitute an unconstitutional taking and a violation of FGIC's and Authority Bondholders' due process rights.

140.    In addition, the Executive Orders violate the Equal Protection Clause by intentionally and arbitrarily appropriating and diverting the Pledged Funds, i.e. the senior

secured collateral of FGIC and the Authority Bondholders, in violation of the Debt Priority Provisions and the OMB Act because other available resources existed from which the public debt could be paid, including available resources that were also subject to Clawback. Because the assignees and pledgees of such other available resources are similarly situated to FGIC and the Authority Bondholders as assignees or pledgees of the Pledged Funds, the Equal Protection Clause commands the Commonwealth treat the assignees and pledgees of such other available resources, FGIC and the Authority Bondholders as assignees and pledgees alike under the Debt Priority Provisions and the OMB Act. Accordingly, the Executive Orders deny FGIC and the Authority Bondholders of their constitutional right to equal protection of the laws and, therefore, violate the Equal Protection Clause.

141. As set forth above, the Executive Orders have deprived FGIC of its rights under the Fifth and Fourteenth Amendments of the United States Constitution. Based on these violations of FGIC's rights under the United States Constitution, FGIC also seeks declaratory and injunctive relief pursuant to 42 U.S.C. § 1983.

### FIRST CLAIM FOR RELIEF
**(For Declaratory Relief Pursuant to 28 U.S.C. §§ 2201 and 2202
that the Constitutional Debt Priority Provision, the OMB Act and the Executive Orders are Unconstitutional)**

142. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 141 hereof, as if fully set forth herein.

143. The issuance and implementation of the Executive Orders and Clawback pursuant to the Constitutional Debt Priority Provision and the OMB Act have harmed Plaintiff and the Authority Bondholders by diverting funds contractually pledged to secure the payment of the Authority Bonds to other purposes.

144. An actual justiciable controversy exists between the parties.

-46-

145.    Plaintiff is entitled to an order declaring (a) that the Constitutional Debt Priority Provision, the OMB Act and the Executive Orders are unconstitutional on the grounds that (i) they are  expressly preempted by Section 903(1) of the Bankruptcy Code; (ii) they improperly operate in a field that Congress has comprehensively occupied; (iii) they conflict with the federal Bankruptcy Code and their debt adjustment procedures stand as an obstacle to accomplishing and executing Congress's purposes and objectives in enacting a uniform bankruptcy code; and (b) that the Constitutional Debt Priority Provision, the OMB Act and the Executive Orders are invalid, null, and void.

**SECOND CLAIM FOR RELIEF**
**(Injunctive Relief for Violations of the Supremacy and Bankruptcy Clauses**
**Against All Defendants)**

146.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 145 hereof, as if fully set forth herein.

147.    137.    The issuance and implementation of the Executive Orders and Clawback pursuant to the Constitutional Debt Priority Provision and the OMB Act has harmed Plaintiff and the Authority Bondholders by diverting funds contractually pledged to secure the payment of the Authority Bonds to other purposes.

148.    An actual justiciable controversy exists between the parties.

149.    If the Commonwealth takes further action pursuant to the Constitutional Debt Priority Provision, the OMB Act and the Executive Orders to divert Pledged Funds from payment of the Authority Bonds to other purposes, then such diversion will result in imminent and irreparable harm to Plaintiff and the Authority Bondholders by reducing the amount of collateral securing the Authority Bonds and causing a payment default on the Authority Bonds.

150.    In addition, enforcement of the Executive Orders will cause immediate and irreparable harm by substantially impairing Plaintiff's and the Authority Bondholders'

contractual interests in a manner that violates the Supremacy Clause and the Bankruptcy Clause of the United States Constitution.

151.     Plaintiff is entitled to an injunction prohibiting Defendants from taking or causing to be taken any action pursuant to the Constitutional Debt Priority Provision, the OMB Act and the Executive Orders.

## THIRD CLAIM FOR RELIEF
### (For Declaratory Relief Pursuant to 28 U.S.C. §§ 2201 and 2202 for Violations of the Contracts Clause Against All Defendants)

152.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 151 hereof, as if fully set forth herein.

153.     The issuance and implementation of the Executive Orders has harmed Plaintiff and the Authority Bondholders by diverting funds contractually pledged to secure the payment of the Authority Bonds to other purposes.

154.     An actual justiciable controversy exists between the parties.

155.     Plaintiff is entitled to an order declaring (i) that the Executive Orders are unconstitutional on the grounds that the Executive Orders violate the Contracts Clause of Article I of the United States Constitution; (ii) that the Executive Orders unlawfully interfere with and impede Plaintiff's contractual rights; and (iii) that the Executive Orders are invalid, null, and void.

## FOURTH CLAIM FOR RELIEF
### (Injunctive Relief for Violations of the Contracts Clause Against All Defendants)

156.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 155 hereof, as if fully set forth herein.

157.    The issuance and implementation of the Executive Orders has harmed Plaintiff and the Authority Bondholders by diverting funds contractually pledged to secure the payment of the Authority Bonds to other purposes.

158.    An actual justiciable controversy exists between the parties.

159.    If the Executive Orders are enforced and Defendants act pursuant to the Executive Orders to divert Pledged Funds from payment of the Authority Bonds to other purposes, then such diversion will result in imminent and irreparable harm to Plaintiff and the Authority Bondholders by reducing the amount of collateral securing the Authority Bonds and causing a payment default on the Authority Bonds.

160.    In addition, enforcement of the Executive Orders will cause immediate and irreparable harm by substantially impairing Plaintiff's and the Authority Bondholders' contractual interests in a manner that violates the Contracts Clause of Article I of the United States Constitution.

161.    Plaintiff is entitled to an injunction prohibiting Defendants from taking or causing to be taken any action pursuant to the Executive Orders.

### FIFTH CLAIM FOR RELIEF
**(For Declaratory Relief Pursuant to 28 U.S.C. §§ 2201 and 2202 for
Violations of the Takings, Due Process, and Equal Protection Clauses Pursuant to 28
U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 1983 Against All Defendants)**

162.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 161 hereof, as if fully set forth herein.

163.    The issuance and implementation of the Executive Orders has harmed Plaintiff and the Authority Bondholders by (i) taking funds in which Plaintiff and the Authority Bondholders hold a property interest without providing Plaintiff and the Authority Bondholders with just compensation; (ii) depriving Plaintiff and the Authority Bondholders of funds in which

Plaintiff and the Authority Bondholders hold a property interest without due process of law; and (iii) intentionally and arbitrarily appropriating and diverting the Pledged Funds.

164.    An actual, justiciable controversy exists between the parties.

165.    Plaintiff is entitled to an order declaring (i) that the Executive Orders are unconstitutional on the grounds that the Executive Orders violate the Fifth and Fourteenth Amendments of the United States Constitution; (ii) FGIC is entitled to declaratory and injunctive relief under 42 U.S.C. § 1983 due to the Executive Orders depriving FGIC of its rights under the United States Constitution and (iii) that the Executive Orders are invalid, null, and void.

### SIXTH CLAIM FOR RELIEF
**(Injunctive Relief for Violations of the Takings,
Due Process, and Equal Protection Clauses Against All Defendants)**

166.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 165 hereof, as if fully set forth herein.

167.    The issuance and implementation of the Executive Orders has harmed Plaintiff and the Authority Bondholders by (i) taking funds in which Plaintiff and the Authority Bondholders hold a property interest without providing Plaintiff and the Authority Bondholders with just compensation (ii) depriving Plaintiff and the Authority Bondholders of funds in which Plaintiff and the Authority Bondholders hold a property interest without due process of law and (iii) intentionally and arbitrarily appropriating and diverting only the PRIFA Pledged Funds despite the existence of other available resources from which the public debt could be paid.

168.    If the Executive Orders are enforced and Defendants act pursuant to the Executive Orders to take Pledged Funds in which Plaintiff and the Authority Bondholders hold a property interest and to deprive Plaintiff and the Authority Bondholders of access to such Pledged Funds, then such taking will result in imminent and irreparable harm to Plaintiff and the Authority

Bondholders by reducing the amount of collateral securing the Authority Bonds and causing a payment default on the Authority Bonds.

169.    In addition, enforcement of the Executive Orders will cause immediate and irreparable harm by depriving Plaintiff and the Authority Bondholders of their property rights in a manner that violates the Takings, Due Process and Equal Protection Clauses of the United States Constitution.

170.    Plaintiff is entitled to an injunction prohibiting the Defendants from taking or causing to be taken any action pursuant to the Executive Orders.

## **RELIEF REQUESTED**

WHEREFORE Plaintiff respectfully requests that the Court enter judgment against Defendants as follows:

(a)    Declaring the Constitutional Debt Priority Provision, the OMB Act and the Executive Orders (x) are unconstitutional on the grounds that (i) they are  expressly preempted by Section 903(1) of the Bankruptcy Code; (ii) they improperly operate in a field that Congress has comprehensively occupied; (iii) they conflict with the federal Bankruptcy Code and their debt adjustment procedures stand as an obstacle to accomplishing and executing Congress's purposes and objectives in enacting a uniform bankruptcy code; and (y) are invalid, null, and void.

(b)    Declaring (i) that the Executive Orders are unconstitutional on the grounds that the Executive Orders violate the Contracts Clause of Article I of the United States Constitution; (ii) that the Executive Orders unlawfully interfere with and impede the Plaintiff's contractual rights; and (iii) that the Executive Orders are invalid, null, and void;

(c)    Declaring (i) that the Executive Orders are unconstitutional on the grounds that the Executive Orders violate the Fifth and Fourteenth Amendments of the United States

Constitution (ii) that the Executive Orders violate 42 U.S.C. § 1983; and (iii) that the Executive Orders are invalid, null, and void;

(d)      Enjoining Defendants from taking or causing to be taken any action pursuant to the Constitutional Debt Priority Provision, the OMB Act or the Executive Orders.

(e)      Enjoining Defendants from taking or causing to be taken any action pursuant to the Executive Orders;

(f)      Granting Plaintiff such other and further relief as this Court may deem just and proper.

Dated: January 19, 2016

REXACH & PICÓ, CSP

By: */s/ María E. Picó*
    María E. Picó
    USDC-PR 123214
    802 Ave. Fernández Juncos
    San Juan PR 00907-4315
    Telephone: (787) 723-8520
    Facsimile: (787) 724-7844
    E-mail: mpico@rexachpico.com

By: */s/ Mariano A. Mier Romeu*
    Mariano A. Mier Romeu
    USDC-PR 217203
    802 Ave. Fernández Juncos
    San Juan PR 00907-4315
    Telephone: (787) 723-8520
    Facsimile: (787) 724-7844
    E-mail: mmier@rexachpico.com

BUTLER SNOW LLP

By: */s/ Stanford G. Ladner*
    Stanford G. Ladner (admission pending)
    1700 Broadway, 41st Floor
    New York, NY 10019
    Telephone: (646) 606-3996
    Facsimile: (646) 606-3995
    E-mail: stan.ladner@butlersnow.com

    Christopher R. Maddux (admission pending)
    J. Mitchell Carrington (admission pending)
    1020 Highland Colony Parkway, Suite 1400
    Ridgeland, MS 39157
    Telephone: (601) 985-2200
    Facsimile: (601) 985-4500
    E-mail: chris.maddux@butlersnow.com
           mitch.carrington@butlersnow.com

*Attorneys for Financial Guaranty Insurance Company*